**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **C.M., individually and through his Parents, CM SENIOR and JM,** | : : : : | |
| Plaintiff, | : : | CIVIL ACTION NO. 5:26-CV-00007-JMG |
| v. | : : : | |
| **DAYSPRING CHRISTIAN ACADEMY, et al.,** | : : : : | |
| Defendants. | : : | |

**DEFENDANTS DAYSPRING CHRISTIAN ACADEMY, DANIEL STONE, SANDY ABEL, JEFF FUNK, JANICE MARTINO-GOTSHALL, MATT LAPP, DR. MICHAEL R. MYERS, ART REMINGTON, JEFF SMOKER, AND KEVIN ZIMMERMAN TO PLAINTIFF'S COMPLAINT**

Defendants Dayspring Christian Academy ("DCA"), Daniel Stone, Sandy Abel, Jeff Funk, Janice Martino-Gotshall, Matt Lapp, Dr. Michael R. Myers, Art Remington, Jeff Smoker, and Kevin Zimmerman (hereinafter "Answering Defendants"), by and through their undersigned counsel, hereby answer Plaintiff's CM's ("Plaintiff") Complaint, as follows:

### I.    PARTIES

1. Plaintiff, CM is 19 years of age, born January 5, 2006. CM was a minor at the time in which the incidents occurred that are the subject of this Complaint.

**ANSWER: Admitted upon information and belief.**

2. CM is disabled. He has medical diagnoses of Autism and Attention Hyperactivity Deficit Disorder and presents as a person with disabilities. Additionally, CM was born with hydrocephalus.

**ANSWER: Admitted upon information and belief that Plaintiff has medical diagnoses of Autism and ADHD, and was born with hydrocephalus. The remaining allegations of this**

1

**paragraph state a characterization and conclusion to which no response is required. To the extent a response is deemed required, denied.**

3. CM was identified as a student with disabilities by his home school district, Hempfield School District. In a reevaluation dated November 9, 2023, CM received educational classifications of Autism, Specific Learning Disability, and Speech and Language. DCA was provided with this reevaluation report.

**ANSWER: Admitted upon information and belief. Defendants deny any further characterization of the reevaluation report, its findings, or its contents not expressly admitted herein, and aver that the reevaluation report speaks for itself.**

4. CM's parents, CM Senior and JM, have power of attorney over CM, including but not limited to the powers to pursue claims and litigation on his behalf.

**ANSWER: Answering Defendants lack knowledge or information sufficient to form a belief as to the allegations of this paragraph, and the same are therefore denied. The remaining allegations state a legal conclusion to which no response is required.**

5. Defendant, Dayspring Christian Academy ("DCA") is a small Christian private school in Lancaster County, Pennsylvania.

**ANSWER: Admitted.**

6. Defendant, Daniel Stone, is the current Headmaster of DCA, former Principal of DCA ("Headmaster Stone" or "Principal Stone"). This Complaint is being filed against Headmaster Stone in his capacity as headmaster of DCA and in his individual capacity.

**ANSWER: Admitted that Daniel Stone is the current Headmaster of DCA and formerly served as Principal of DCA. The remaining allegations describe the capacity in which this action is brought and require no response because they are legal conclusions.**

7. Defendant, LS, born in 2007, was a student at DCA in CM's class and the son of Headmaster Stone and was a minor at the time in which the incidents occurred that are the subject of this complaint.

**ANSWER: Admitted that LS was born in 2007, was a student at DCA in CM's grade level, was a minor during his entire enrollment at DCA, and is the son of Headmaster Stone. The rest of the allegations of this paragraph are denied.**

8. Defendants, Sandy Abel, Jeff Funk, Janice Martino-Gotshall, Matt Lapp, Dr. Michael R. Myers1, Art Remington, Jeff Smoker, and Kevin Zimmerman, are all members of DCA's Board of Trustees ("board members"). This Complaint is being filed against each board member in their capacity as board members and in their individual capacities.

**ANSWER: Admitted that the named individuals are members of DCA's Board of Trustees. The remaining allegations describe the capacity in which this action is brought and require no response because they are legal conclusions.**

9. Upon information and belief, DCA applied for and received federal funds through the Paycheck Protection Program ("PPP") administered by the Small Business Administration pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020).

**ANSWER: Admitted that DCA applied for and received a Paycheck Protection Program loan. The remaining allegations require no response because they are legal conclusions, and are therefore denied.**

10. Upon information and belief, DCA received PPP loans during 2020-2021 and was in the repayment period during the time the incidents occurred that are the subject of this Complaint.

**ANSWER: Denied as stated. Upon information and belief, Answering Defendants admit that DCA received a PPP loan during 2020, and that this loan was forgiven in the 2020-2021 school year. Upon information and belief, Answering Defendants specifically deny that any PPP loan remained outstanding, unforgiven, or was "in repayment" during the 2022-2023 school year, when the operative incidents alleged in the Complaint are alleged to have occurred. The remaining allegations of this paragraph are denied.**

11. Upon information and belief, these federal PPP funds were used to pay the salaries of DCA staff, including administrators, teachers, and personnel responsible for C.M.'s supervision and

education, and to maintain school operations during the period in which the discrimination and abuse occurred.

**ANSWER: Admitted in part, denied in part. It is admitted that PPP funds were in part used to cover payroll costs 2020. Answering Defendants specifically deny that any PPP funds were used "to maintain school operations during the period in which the discrimination and abuse occurred," as alleged, and further specifically deny that any "discrimination" or "abuse" occurred at all. Defendants lack knowledge or information sufficient to form a belief as to the specific allocation of PPP funds to particular categories of personnel, including those "responsible for C.M.'s supervision and education" and the same is therefore denied.**

12. DCA also participates in Pennsylvania's Educational Improvement Tax Credit ("EITC") and Opportunity Scholarship Tax Credit ("OSTC") programs. Participation in those programs requires it to abide by state and federal anti-discrimination laws. 24 Pa. Stat. § 20- 2011-B.

**ANSWER: Admitted that DCA participates in the EITC and OSTC programs. The remaining allegations state a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

13. Although DCA purports to have a Christian-based curriculum, it is not a religious entity, a religious organization, or an entity controlled by a religious organization.

**ANSWER: Denied as stated, in that DCA provides all its students a Biblical and Christian Education. The remaining allegations state a legal conclusion to which no response is required.**

14. DCA operates as a place of public accommodation under the ADA. DCA holds itself out to the public as an educational institution providing secular education services, conferring diplomas recognized by the Commonwealth of Pennsylvania, and preparing students for secular university admission.

**ANSWER: Denied. Answering Defendants specifically deny that DCA's educational program is "secular." The remaining allegations state a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

15. DCA is not controlled by a specific church or religious order but is governed by an independent Board of Trustees.

**ANSWER: Admitted in part, denied in part. Answering Defendants admit only that DCA is governed by a Board of Trustees. The remaining allegations state a legal conclusion to which no response is required.**

16. DCA is not a place of worship.

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

17. DCA's admissions policies and employment practices function commercially in the marketplace of private education.

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

## II.    JURISDICTION AND VENUE

18. This Court has original jurisdiction over this Action pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act (RA) of 1973.

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

19. This Court has supplemental jurisdiction over the state claims raised in this Action pursuant to 28 U.S.C. § 1367 because they are related to the federal question claims and form part of the same case or controversy.

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

20. Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred in Lancaster County, Pennsylvania, which is located within this judicial district, and because Defendant DCA is located within this district.

**ANSWER: Admitted that DCA is located in Lancaster County, Pennsylvania, within the Eastern District of Pennsylvania. The remaining allegations state a legal conclusion to which no response is required.**

### III.    ADDITIONAL FACTS SUPPORTING LIABILITY

21. CM attended DCA Academy from 6th through 12th grades, graduating in the spring of 2025. At all times during his enrollment at DCA, CM was a student with disabilities.

**ANSWER: Admitted that CM attended DCA from approximately 6th through 12th grade and graduated in the spring of 2025. The remaining allegations state a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

22. The DCA administration was aware of CM's disabilities. He was provided services for his disabilities through a program that DCA calls a P139 program.

**ANSWER: It is admitted that DCA administration was aware of CM having Autism, and that he was provided services for this through the P139 program. It is further admitted that the DCA administration knew that CM was diagnosed with ADHD and that DCA administration knew that CM was born with hydrocephalus. The remaining allegations are denied.**

23. P139 is a program specific to DCA, named after Psalm 139. There was a P139 classroom called "Daybreak" in which they had a modified curriculum. In DCA's handbook, it describes Daybreak as follows, in relevant part:

> Students who receive services in this program have mild to moderate learning needs. The focus of this program is to support and/or modify the regular educational curriculum, or to replace subjects within the regular educational curriculum to allow maximum success for the student.

**ANSWER: Admitted only that DCA's P139 program is named after Psalm 139 and that DCA's Daybreak classroom may offer methods of instruction and intervention for students with learning needs. Answering Defendants admit only that the language quoted in this paragraph appears in DCA's handbook and is a writing that speaks for itself. The remaining allegations are as legal conclusions to which no response is required and are therefore denied.**

24. Students with more academic needs (like CM) spent more time in that classroom than students with fewer needs.

**ANSWER: Denied as stated. Answering Defendants admit that time spent in the Daybreak classroom is individualized based on each student's needs as reflected in the student's P139 plan. The remaining allegations state a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

25. CM also had a P139 plan, a written document specifying that he would be receiving a modified curriculum with replacement subjects in English/Literature and math, along with both social and academic goals, specifically designed instruction and intervention, and testing modifications.

**ANSWER: Admitted that CM had a P139 plan, which is a written document that speaks for itself, and deny any characterization of its contents inconsistent with it. To the extent any allegation is not a legal conclusion, it is denied.**

26. During his time at DCA, CM was subjected to relentless bullying and harassment by his peers due to his disability. Much of this persistent abuse came from Headmaster Stone's son, LS.

**ANSWER: Denied. Answering Defendants specifically deny that CM was subjected to "relentless bullying and harassment by his peers due to his disability" or that Headmaster Stone's son was the source of any "persistent abuse."**

27. CM and LS were in the same grade class, and knew each other the entire time that CM was enrolled, starting in 6th grade.

**ANSWER: Admitted.**

28. LS also spent some time in the P139 classroom, for reasons unknown to CM and his parents.

**ANSWER: Admitted that LS spent some time in the P139 classroom. Answering Defendants lack knowledge or information sufficient to form a belief as to what is or is not known to CM and his parents, and the same is therefore denied.**

29. During his time at DCA, CM was subject to the following by LS, including but not limited to: a. LS often called CM a "sped" and "retard" throughout his time at DCA. Additionally, he would frequently stab CM with pencils and other objects leaving marks. b. LS cornered CM and whipped him with a belt in a bathroom at DCA. This horrendous whipping is on video and occurred

on or about January 2023. c. Fellow DCA students cornered CM and poked objects at his anus. LS was involved in this incident. This cruel form of sexual harassment (referred to as "rounding") against CM occurred twice on DCA's campus, on or about January 2023 to May 2023.

**ANSWER: Denied. Answering Defendants lack knowledge or information sufficient to form a belief as to the specific conduct alleged to have been committed by LS, who is not represented by the undersigned counsel, and the allegations of this paragraph are therefore denied. Answering Defendants specifically deny any allegation that Answering Defendants had knowledge of, condoned, or failed to act upon the specific incidents described in this paragraph at the time alleged.**

30. Unfortunately, these above-described incidents should not have happened to CM.

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion and/or opinion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

31. LS had been a known bully to the DCA Administration and board members for many years.

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion and/or opinion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

32. For many years prior to and including the 22-23 school year, parents and students submitted complaints to DCA administration and board members regarding LS for making sexualized comments in class, name calling, verbal harassment, assault, and pushing students in bathroom stalls while they urinated, among other forms of bullying and harassment.

**ANSWER: Denied as stated. Answering Defendants admit only that, over the course of LS's enrollment, DCA administration received some behavior events about LS. Those events are documents which speak for themselves. Answering Defendants deny any characterization of its contents that is inconsistent with its full text and context. The remaining allegations of this paragraph are denied.**

33. Many of LS's victims were students in the P139 classroom, with known disabilities to DCA's administration. Many are protected under the Americans with Disabilities Act (ADA), including at least one other student with autism, like CM.

**ANSWER: Denied as stated. Answering Defendants admit only that CM was diagnosed with Autism, and that other students in the P139 classroom also may have been diagnosed with certain disabilities. The remaining allegations in this paragraph state legal conclusions to which no response is required and are therefore denied. To the extent any allegation is not a legal conclusion, Answering Defendants lack knowledge or information sufficient to form a belief as to the same, and the allegations are therefore denied.**

34. Prior to and during the 2022-2023 school year, DCA administrators and board members were aware that much of LS's bullying and harassment was directed towards students with disabilities in the P139 classroom, and that those students were being bullied because of their disability.

**ANSWER: Denied as stated. Answering Defendants admit only that DCA administrators would receive reports of student conduct issues, as referenced in their Answers to Paragraphs 32 and 36-39. The remaining allegations of this paragraph are denied.**

35. Administrators of DCA, including Headmaster Stone and former Headmaster, board member Michael Myers, responded to these complaints of LS with inappropriate remarks such as "boys will be boys" and "what do you want me to do about it?"

**ANSWER: Denied.**

36. Through various emails to parents of students at DCA, Headmaster Stone made clear that he was aware of bullying issues in LS's grade class.

**ANSWER: Denied as stated. Answering Defendants admit only that Stone communicated with parents regarding student conduct matters. The remaining allegations of this paragraph are denied.**

37. For example, on October 18, 2018, then-Principal Stone sent an email to the parents of 6th grade boys (both CM and LS's grade year at the time). In that email, Principal Stone describes with detail that he is aware of allegations including the following direct quotes: a. Hallway - bumping into each other, kicking/tripping, poking, shoving into or against lockers, etc. b. Lunch table - stealing food, "roasting" or "burning" (insults) c. Bathroom--shoving into urinals, kicking stall doors open, "pantsing"

9

**ANSWER: Admitted that on or about October 18, 2018, then-Principal Stone sent correspondence to parents of 6th grade boys, which email speaks for itself. Answering Defendants deny any characterization of its contents that is inconsistent with its full text and context. The remaining allegations are denied.**

38. In the October 18, 2018 email, Principal Stone appears to know who was engaging in these behaviors, and either knew or should have known that it was his own son. For example, Headmaster Stone referred to the possible offenders as "boys." He stated that he was in favor of "letting boys be boys," but apparently thought this conduct was "problematic in the school setting."

**ANSWER: Denied. Answering Defendants aver that the email speaks for itself and deny any characterization inconsistent with its full text and context. The remaining allegations are denied.**

39. In the October 18, 2018 email, Principal Stone stated that there will be consequences from teachers for this type of behavior, and he listed those consequences, which included allowing boys to go to the bathroom only one at a time, teachers walking students to their lockers and to next classes, students eating lunch separately, conducting parent conferences, and issuing detentions and in-school suspensions.

**ANSWER: Denied. Answering Defendants aver the email speaks for itself and deny any characterization inconsistent with its full text and context.**

40. Unfortunately, Principal Stone never made changes to class schedules for lunches, never ordered more hallway supervision, and never implemented policies for the staff to limit students, especially boys, in the school bathroom.

**ANSWER: Denied.**

41. If Principal Stone had simply kept his promises to parents in his October 18, 2018 email, much of the severe bullying CM endured could have been prevented.

**ANSWER: Denied. The allegations in this paragraph are speculative and call for a conclusion to which no response is required. To the extent any allegation is not a conclusion, it is denied.**

10

42. Unfortunately, bullying issues in CM and LS's class endured for years later, and Headmaster Stone continued to be aware of those issues, yet took no action to rectify these issues.

**ANSWER: Denied.**

43. On January 26, 2022, Headmaster Stone wrote an email to parents in the 9th grade class (CM and LS's grade year at the time), claiming "I believe wholeheartedly that all of our children are under direct assault from Satan and his demons." He also offered a prayer meeting with the 9th grade parents stating: "While all of our children are on Satan's agenda for destruction, I want to call special attention today to our 9th grade children and ask that you as parents join with us in coming against these attacks, in Jesus' name!"

**ANSWER: Admitted that Headmaster Stone sent correspondence to 9th grade parents on or about January 26, 2022. Answering Defendants aver the email speaks for itself and deny any characterization inconsistent with its full text and context.**

44. On January 30, 2022, Headmaster Stone sent another email clarifying the reasons why he was calling the prayer meeting, which included what he acknowledged had been going on at DCA in the 9th grade class, in direct quotes: a. Immature and/or inappropriate humor, b. General lack of kindness, compassion and consideration towards each other, c. General attitude of ambivalence or apathy towards school. Sometimes, this just looks like apathy. Sometimes it leads to lack of integrity. Sometimes it affects academics and sometimes it has to do with following expectations (being in uniform, being prepared to class, completing work on time, etc.), d. Challenging teachers' authority.

**ANSWER: Admitted that Headmaster Stone sent a follow-up email on or about January 30, 2022. Answering Defendants aver the email speaks for itself and deny any characterization inconsistent with its full text and context. Answering Defendants deny that the matters generally described in that email establish knowledge of disability-based bullying directed at any specific student.**

11

45. Other than a prayer meeting, Headmaster Stone offered no other solutions to rectify bullying concerns, and in fact took none, including failing to discipline known bullies.

**ANSWER: Denied.**

46. By failing to act on known bullying of students, especially students with disabilities, DCA was deliberately indifferent to the "strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." Meagley v. City of Little Rock, 639 F.3d 384, 388 (8th Cir. 2011) (quoting Barber v. Colorado, 562 F.3d 1222,1228-29 (10th Cir. 2009)).

**ANSWER: Denied. The allegations in this paragraph and its accompanying citation state a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

47. DCA's policies of inaction resulted in CM enduring humiliating bullying, harassment, and sexual harassment due to his disability.

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

48. In May of 2023, LS himself bragged to two girls about the "rounding," claiming that another student turns out the lights in the bathroom, pins students down and puts things in their anus.

**ANSWER: Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, which concern statements allegedly made by LS, who is not represented by the undersigned counsel, and the same are therefore denied.**

49. One of the girls who LS bragged to claimed to have seen CM emerge from the bathroom disheveled as if this happened to him. Eventually these incidents and concerns of the girls were brought to the administration at a later date.

**ANSWER: Denied as stated. Answering Defendants admit only that certain concerns were eventually brought to DCA's administration. Answering Defendants lack knowledge or information sufficient to form a belief as to what the girls saw and these allegations are therefore denied.**

12

50. The DCA administration's initial response to these allegations was to accuse the girls who reported them of gossiping. However, eventually, CM was interviewed by the DCA administration who confirmed that he was "rounded" on campus by DCA students. At a later date, LS was identified as one of the perpetrators. It was also revealed at this time that there were other instances of bullying, such as the whipping that CM endured in January of 2023, which also occurred on DCA's campus.

**ANSWER: Admitted in part, denied in part. Answering Defendants admit that DCA administration conducted an investigation, including interviewing CM, after concerns were raised, and that LS and others were named or identified during that process. Answering Defendants deny that any such identification constitutes an admission that the underlying conduct described occurred as alleged, or that LS or any other individual was a "perpetrator" of any such conduct as Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the conduct described and LS is not represented by the undersigned counsel, The remaining allegations are denied.**

51. At a later date, LS admitted to participating in the "rounding" of CM and apologized to CM's parents by way of reading a prepared statement on his phone.

**ANSWER: Answering Defendants lack knowledge or information sufficient to form a belief as to the allegations of this paragraph, which concern conduct and statements of LS, who is not represented by the undersigned counsel, and the same are therefore denied.**

52. LS and other offenders of the "rounding" incidents withdrew from DCA a couple weeks after these incidents came to light.

**ANSWER: Admitted only that LS and other students were removed from DCA for the remainder of the 2022-2023 school year and did not attend DCA for any subsequent years. Answering Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations of this paragraph, and the same are therefore denied.**

53. However, Headmaster Stone allowed LS to return to DCA for extracurricular events that CM was attending. Headmaster Stone did so, without proper notification to CM or his parents ahead of time, further adding to CM's trauma.

**ANSWER: Admitted in part, denied in part. Answering Defendants admit that LS, as a former student and member of the broader DCA community, was not categorically barred**

from attending public extracurricular events open to the community at large. **Answering Defendants lack knowledge or information sufficient to form a belief as to CM's trauma, and this allegation is denied. Answering Defendants deny the remaining characterizations and allegations of this paragraph.**

54. Due to the severe, persistent, and pervasive bullying that CM endured at DCA, CM must see a therapist frequently and attends counseling services at the Center for Autism and Developmental Disabilities. CM's experiences at DCA are a continuing topic at his sessions.

**ANSWER: Answering Defendants deny that CM endured "severe, persistent, and pervasive bullying" at DCA. Further responding, Answering Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations of this paragraph, and the same are therefore denied.**

55. In a counseling session in May of 2025, CM reported to his counselor that he has contemplated taking his own life. This was in the same session in which CM first revealed the trauma that he faced at DCA due to the harassment he endured by LS.

**ANSWER: Answering Defendants lack knowledge or information sufficient to form a belief as to the allegations of this paragraph, and the same are therefore denied.**

**Count I - CM v. DCA; Violations of the ADA, 42 U.S.C. § 12101 et seq:**

56. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

**ANSWER: Answering Defendants state that Count I was dismissed with prejudice by Order of this Court dated June 12, 2026 (ECF No. 35). No further response to Count I is required. Answering Defendants nonetheless respond to the paragraphs below solely because Plaintiff incorporates them by reference into Count II, *infra.* Answering Defendants incorporate by reference their responses to the foregoing paragraphs as if the same were set forth more fully at length herein.**

57. To establish claims under the ADA, a plaintiff must demonstrate that: (1) he has a disability, or was regarded as having a disability; (2) he was "otherwise qualified" to participate in school activities; and (3) he was "denied the benefits of the program or was otherwise subject to discrimination because of [his] disability." Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 189 (3d Cir. 2009).

14

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required.**

58. CM has a disability, specifically autism, in which DCA was aware of through its P139 program and plan for CM.

**ANSWER: Admitted that DCA was aware through its P139 program and plan for CM that he was diagnosed with Autism.**

59. CM was "otherwise qualified" to participate in school activities.

**ANSWER: Denied. The allegation in this paragraph states a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

60. CM was denied the benefits of the educational program or was otherwise subject to discrimination because of his disability due to the severe, persistent and pervasive bullying and harassment he endured by his peers, such as being called names like "sped" and "retard," and enduring humiliation by being whipped by a belt and "rounded."

**ANSWER: Denied. The allegation in this paragraph states a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

61. CM did not obtain the full benefits of the supports and modifications that DCA provided CM through his P139 plan due to his disabilities of which DCA was aware.

**ANSWER: Admitted in part, denied in part. It is admitted only that DCA was aware of CM's disabilities and that it provided CM with individualized methods of instruction and intervention through his P139 plan. The remaining allegations in this paragraph state a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

62. If a plaintiff seeks compensatory damages as a remedy for violations of the ADA, it is not enough to demonstrate only that the plaintiff has made out the prima facie case outlined above. S.H. v. Lower Merion School District, 729 F.3d 248, 261 (3d Cir. 2013). He or she must also demonstrate that the aforementioned discrimination was intentional. Id. A showing of deliberate indifference satisfies that standard. Id. at 263. To satisfy the deliberate indifference standard, a

15

plaintiff "must present evidence that shows both: (1) knowledge that a federally protected right is substantially likely to be violated . . . , and (2) failure to act despite that knowledge." Id. at 265 (citing Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001)).

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required.**

63. DCA administrators and board members had knowledge that a federally protected right is substantially likely to be violated due to the number of complaints of bullying and harassment committed by LS against other students in the P139 classroom, which mainly comprised students with disabilities.

**ANSWER: Admitted in part, denied in part. It is admitted only that the P139 classroom included students with disabilities. The remaining allegation in this paragraph states a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

64. DCA administrators and board members knew that there were students in the P139 classroom who were being bullied and harassed by LS specifically due to their disabilities.

**ANSWER: Denied.**

65. DCA failed to remedy the known bullying and harassment being committed by LS against students in the P139 classroom, which resulted in CM being discriminated against.

**ANSWER: Denied.**

**WHEREFORE: No response required. Count I, and all relief sought thereunder, was dismissed with prejudice by Order of this Court dated June 12, 2026 (ECF No. 35).**

**COUNT II – CM v. DCA; Violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**

66. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

**ANSWER: Answering Defendants incorporate by reference their responses to the foregoing paragraphs as if the same were set forth more fully at length herein.**

16

67. To establish claims under § 504 of the Rehabilitation Act, a plaintiff must demonstrate that: (1) he has a disability, or was regarded as having a disability; (2) he was "otherwise qualified" to participate in school activities; and (3) he was "denied the benefits of the program or was otherwise subject to discrimination because of [his] disability." Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 189 (3d Cir. 2009).

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required.**

68. As a recipient of Federal Financial Assistance, DCA is subject to Section 504 of the Rehabilitation Act and may not discriminate against individuals with disabilities.

**ANSWER: Denied. The allegation that DCA was a "recipient of Federal Financial Assistance" within the meaning of Section 504 during all periods relevant to the Complaint states a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

69. CM had a disability, specifically autism, in which DCA was aware of through its P139 program and plan.

**ANSWER: Admitted that DCA was aware through its P139 program and plan for CM that he was diagnosed with Autism.**

70. CM was "otherwise qualified" to participate in school activities.

**ANSWER: Denied. The allegation in this paragraph states a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

71. CM was denied the benefits of the educational program or was otherwise subject to discrimination because of his disability due to the severe, persistent and pervasive bullying and harassment he endured by his peers, such as being called names like "sped" and "retard," and enduring humiliation by being whipped by a belt and "rounded."

**ANSWER: Denied. The allegation in this paragraph states a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

17

72. CM did not obtain the full benefits of the supports and modifications that DCA provided CM through his P139 plan that CM received due to his disabilities in which DCA was aware.

**ANSWER: Admitted in part, denied in part. It is admitted only that DCA was aware of CM's disabilities and that it provided CM with individualized methods of instruction and intervention through his P139 plan. The remaining allegation in this paragraph states a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

73. If a plaintiff seeks compensatory damages as a remedy for violations of the Rehabilitation Act of 1973, it is not enough to demonstrate only that the plaintiff has made out the prima facie case outlined above. S.H. v. Lower Merion School District, 729 F.3d 248, 261 (3d Cir. 2013). He or she must also demonstrate that the aforementioned discrimination was intentional. Id. A showing of deliberate indifference satisfies that standard. Id. at 263. To satisfy the deliberate indifference standard, a plaintiff "must present evidence that shows both: (1) knowledge that a federally protected right is substantially likely to be violated . . . , and (2) failure to act despite that knowledge." Id. at 265 (citing Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001)).

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required.**

74. DCA administrators and board members had knowledge that a federally protected right is substantially likely to be violated due to the number of complaints of bullying and harassment committed by LS of other students in the P139 classroom, which mainly comprised students with disabilities.

**ANSWER: Admitted in part, denied in part. It is admitted only that the P139 classroom included students with disabilities. The remaining allegation in this paragraph states a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

75. DCA administrators and board members knew that there were students in the P139 classroom who were being bullied and harassed by LS specifically due to their disabilities.

18

**ANSWER: Denied.**

76. DCA failed to remedy the known bullying and harassment being committed by LS against students in the P139 classroom, which resulted in CM being discriminated against.

**ANSWER: Denied.**

**WHEREFORE: Denied as to subparts (i), (j), (k), (m), (n), (o), and (p), and denied that Plaintiff is entitled to any relief sought therein. As to subpart (l) (punitive damages), no response is required, as per the Court's June 12, 2026 Order and accompanying Memorandum Opinion (ECF Nos. 34–35). To the extent a response is deemed necessary as to subpart (l), denied.**

**COUNT III – CM v. All Defendants; Negligence**

77. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

**ANSWER: Answering Defendants incorporate by reference their responses to the foregoing paragraphs as if the same were set forth more fully at length herein.**

78. Under Pennsylvania law, a negligence claim consists of four elements: (1) a duty or obligation recognized by the law requiring the actor to conform to a certain standard of conduct; (2) a failure to conform to the required standard; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the interests of another. Rabutino v. Freedom State Realty Co., Inc., 2002 Pa. Super. 318, 809 A.2d 933, 938 (Pa. Super. 2002).

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required.**

79. School administrators and board members have a duty to ensure a safe environment for all school children, including vulnerable children with disabilities like CM. DCA's code of conduct states that the purposes of the standards in it are to "cultivate a healthy campus atmosphere, free of distractions that impede students from living a healthy Christian life." DCA's disciplinary policy states that "[e]ach teacher provides a positive, inspiring classroom atmosphere that will encourage children to exemplify the character of Jesus."

**ANSWER: Admitted that DCA's code of conduct and disciplinary policy contains the quoted language, which are parts of documents that speak for themselves. The allegation regarding the scope of any duty owed states a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

80. Additionally, DCA has a bullying policy, stating that DCA "is committed to being a bully-free zone."

**ANSWER: Admitted that DCA's handbook contains the quoted language, which speaks for itself.**

81. DCA administrators and board members failed to adhere to the required standard of care by failing to remedy known bullying and harassment, and by failing to take reasonable steps to curb these known issues, such as limiting students leaving class, securing bathrooms, and other items suggested by Headmaster Stone (then Principal Stone) in his October 18, 2018 email to parents.

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

82. Additionally, the failures of DCA administrators and board members to remedy known repeated bullying and harassment rises to the level of gross negligence.

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

83. In failing to remedy known repeated bullying and harassment by LS, DCA administrators (Headmaster Stone) and board members acted outside their official capacity and for personal reasons in an effort to not punish and to protect LS due to him being the headmaster's son and grandson of Dr. Myers, a board member and founder of the school.

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

20

84. Additionally, Answering Defendants' failures to remedy known bullying rises to the level of gross negligence (a "flagrant" or "gross deviation" from the ordinary negligence standard. Feleccia v. Lackawanna Coll., 654 Pa. 324, 353 (2019).

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

85. CM was harmed due to DCA's failures to take reasonable steps to remedy known bullying and harassment occurring in the school building, and by failing to have appropriate control over DCA's students and the school building generally.

**ANSWER: Denied.**

86. CM suffered damages for which all defendants are joint and severally liable. CM must now see a therapist frequently and has contemplated taking his own life over the harassment he endured by LS that occurred at DCA.

**ANSWER: Denied. The allegation regarding joint and several liability states a legal conclusion to which no response is required. Answering Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations of this paragraph, and the same are therefore denied.**

**WHEREFORE clause following Paragraph 86: Denied. Answering Defendants deny that Plaintiff is entitled to any of the relief sought.**

**COUNT IV – CM v. DCA; Breach of Contract**

87. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

**ANSWER: Answering Defendants incorporate by reference their responses to the foregoing paragraphs as if the same were set forth more fully at length herein.**

88. To state a claim for breach of contract under Pennsylvania law, a plaintiff must plead "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and (3) resultant damages." Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C., 635 Pa 427 (2016).

21

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required.**

89. In Pennsylvania, "the relationship between a private educational institution and an enrolled student is contractual in nature. . . ." <u>Swartley v. Hoffner</u>, 734 A.2d 915, 919 (Pa. Super. 1999).

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required.**

90. The contract between a private institution and a student is comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution. <u>Id.</u>

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required.**

91. DCA's Student Handbook was posted on DCA's website. Each year, DCA required families to review and attest that they reviewed it in order to continue enrollment for their child.

**ANSWER: Denied as stated. It is admitted only the Family and Student Handbook was posted on DCA's website, and that every year a parent/guardian was required to confirm their review of and agreement with the Family and Student Handbook.**

92. Each year of CM's enrollment at DCA, CM and his parents were required to read and sign an attestation that they reviewed the DCA student handbook and agreed to its provisions.

**ANSWER: Denied as stated. It is admitted only that every year a parent/guardian was required to confirm their review of and agreement with the Family and Student Handbook.**

93. DCA's code of conduct (incorporated in its Student Handbook) states that the purposes of the standards in it are to "cultivate a healthy campus atmosphere, free of distractions that impede students from living a healthy Christian life." DCA's disciplinary policy states that "[e]ach teacher provides a positive, inspiring classroom atmosphere that will encourage children to exemplify the character of Jesus."

**ANSWER: Admitted that DCA's Family and Student Handbook contains the quoted language, which is a document that speaks for itself.**

94. Additionally, DCA has a bullying policy (also incorporated in its student handbook), stating that DCA "is committed to being a bully-free zone."

**ANSWER: Admitted that DCA's Family and Student Handbook contains the quoted language, which speaks for itself.**

95. DCA's bullying policy provides that DCA will discipline students who engage in bullying.

**ANSWER: Admitted that DCA's bullying policy is a document which speaks for itself. Answering Defendants deny any characterization inconsistent with the full text of the policy.**

96. DCA failed to remedy known bullying in accordance with its Student Handbook, particularly bullying of LS, and failed to enforce its bullying policies.

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

97. In failing to remedy known bullying and enforce its policies, DCA violated provisions of its Student Handbook.

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

98. CM suffered damages as a result of DCA failing to remedy known bullying in accordance with its Student Handbook.

**ANSWER: Denied. The allegations in this paragraph state a legal conclusion to which no response is required. To the extent any allegation is not a legal conclusion, it is denied.**

99. Additionally, CM had a P139 plan, a written document that was agreed to between CM and his parents and DCA.

**ANSWER: Admitted only that CM's parents would review and approve the content of CM's P139 plan. The remaining allegations are denied.**

100. CM did not obtain the full benefits of the supports and modifications that DCA provided CM through his P139 plan that CM received due to his disabilities in which DCA was aware due to the severe, persistent and pervasive bullying he experienced at DCA.

**ANSWER: Admitted in part, denied in part. It is admitted only that DCA was aware of CM's disabilities and that it provided CM with individualized methods of instruction and intervention through his P139 plan. Answering Defendants specifically deny that CM experienced "severe, persistent and pervasive bullying" at DCA. The remaining allegations, including the characterization that CM did not obtain the full benefit of the P139 program, are denied.**

**WHEREFORE clause following Paragraph 100: Denied. Answering Defendants deny that Plaintiff is entitled to any of the relief sought.**

**COUNT V – CM v. LS; Battery**

101.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

**ANSWER: Answering Defendants incorporate by reference their responses to the foregoing paragraphs as if the same were set forth more fully at length herein, to the extent a response by Answering Defendants is required to a Count that asserts no claim against them.**

102.    An actor is subject to liability to another for battery if a) he acts intending to cause a harmful or offensive contact with the person…and b) an offensive contact with the person of the other directly or indirectly results. Restatement (Second) of Torts § 18.

**ANSWER: No response required, as this Count does not assert a claim against Answering Defendants. To the extent a response is deemed required, the allegations state a legal conclusion to which no response is required.**

103.    LS committed battery against CM by whipping him with a belt in the school bathroom, which was in fact harmful and offensive contact of CM.

**ANSWER: No response required, as this Count does not assert a claim against Answering Defendants. To the extent a response is deemed required, Answering Defendants lack knowledge or information sufficient to form a belief as to the allegations of this paragraph, which concern the conduct of LS, and the same are therefore denied.**

104.    LS committed battery against CM by participating in an act where CM was "rounded," where CM was cornered and objects were poked at his anus, which was in fact harmful and offensive contact of CM.

**ANSWER: No response required, as this Count does not assert a claim against Answering Defendants. To the extent a response is deemed required, Answering Defendants lack knowledge or information sufficient to form a belief as to the allegations of this paragraph, which concern the conduct of LS, and the same are therefore denied.**

**WHEREFORE clause following Paragraph 104: No response required, as this Count does not seek relief against Answering Defendants.**

## COUNT VI – CM v. LS; Assault

105.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

**ANSWER: Answering Defendants incorporate by reference their responses to the foregoing paragraphs as if the same were set forth more fully at length herein, to the extent a response by Answering Defendants is required to a Count that asserts no claim against them.**

106.     The tort of assault occurs whenever an actor intentionally causes an imminent apprehension of a harmful or offensive bodily contact. Sides v. Cleland, 436 Pa. Super. 618, 648 A.2d 793 (1994) (citing Restatement (Second) of Torts § 21).

**ANSWER: No response required, as this Count asserts does not assert a claim against Answering Defendants. To the extent a response is deemed required, the allegations state a legal conclusion to which no response is required.**

107.     CM was placed in imminent apprehension of harmful or offensive bodily contact when he was whipped by LS with a belt in the school bathroom.

**ANSWER: No response required, as this Count does not assert a claim against Answering Defendants. To the extent a response is deemed required, Answering Defendants lack knowledge or information sufficient to form a belief as to the allegations of this paragraph, which concern the conduct of LS, and the same are therefore denied.**

108.     CM was placed in imminent apprehension of harmful or offensive bodily contact when he was "rounded," where CM was cornered and objects were poked at his anus, incidents in which LS was a participant.

**ANSWER: No response required, as this Count does not assert a claim against Answering Defendants. To the extent a response is deemed required, Answering Defendants lack**

25

**knowledge or information sufficient to form a belief as to the allegations of this paragraph, which concern the conduct of LS, and the same are therefore denied.**

**WHEREFORE clause following Paragraph 108: No response required, as this Count does not seek relief against Answering Defendants.**

### AFFIRMATIVE DEFENSES

1. The Complaint fails, in whole or in part, to state a claim upon which relief can be granted.

2. Count I has been dismissed with prejudice by Order of this Court dated June 12, 2026 (ECF No. 35), and Plaintiff's claim for punitive damages under Count II has likewise been dismissed with prejudice by that same Order. Plaintiff is barred from seeking any relief foreclosed by that Order.

3. DCA is a religious organization, and/or an entity controlled by a religious organization, within the meaning of 42 U.S.C. § 12187, as evidenced by, among other things, DCA's express religious mission and purpose as reflected in its governing and publicly filed documents, its religious curriculum, admissions, and personnel requirements, and its religious practices and observances, and is therefore exempt from the provisions of Title III of the ADA. Answering Defendants preserve this defense notwithstanding the Court's determination that resolution of this issue would be premature at the pleading stage and moot based on its dismissal of the ADA claim.

4. Answering Defendants engaged in good-faith efforts to comply with all applicable federal, state, and local laws prohibiting disability discrimination.

5. Answering Defendants did not act with deliberate indifference toward any federally protected right of Plaintiff, and any response to reported student conduct was reasonable under the circumstances then known to Answering Defendants.

6. Plaintiff's claims are barred, in whole or in part, because any alleged conduct of LS was the independent, intentional, and unforeseeable act of a third party for which Answering Defendants are not legally responsible.

7. Plaintiff's damages, if any, were caused in whole or in part by the acts or omissions of persons or entities other than Answering Defendants, including but not limited to LS, for whose conduct Answering Defendants are not legally responsible.

8. Plaintiff's negligence claim is barred, in whole or in part, because Answering Defendants owed no duty beyond the standard of reasonable care under the circumstances, which standard was met.

9. Plaintiff's negligence claim (Count III) is barred, in whole or in part, by the gist of the action doctrine, because the duties Plaintiff alleges Answering Defendants breached arise solely from, and are coextensive with, the Student Handbook and Code of Conduct underlying Plaintiff's breach of contract claim (Count IV), and not from any duty independent of that alleged contractual relationship.

10. The Board Member Defendants are entitled to the protections of the Federal Volunteer Protection Act and/or Pennsylvania law governing volunteer officers, directors, and trustees of nonprofit organizations, 42 Pa. C.S. §§ 8332.2, and/or any other applicable limitation on liability for uncompensated officers, trustees, or directors of nonprofit organizations, to the extent applicable.

11. Plaintiff's breach of contract claim is barred, in whole or in part, because the Student Handbook did not form a contract between the parties.

12. Plaintiff's breach of contract claim is barred, in whole or in part, because DCA did not breach any term of the Student Handbook or any other agreement between the parties.

27

13. Plaintiff's breach of contract claim is barred, in whole or in part, to the extent the Student Handbook reserves discretion to DCA in matters of student discipline and supervision, and DCA's exercise of that discretion was reasonable.

14. Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations to the extent any alleged conduct falls outside the limitations period applicable to each cause of action.

15. Plaintiff's claims for non-economic and punitive damages, to the extent not already foreclosed by the Court's June 12, 2026 Order, are barred or limited by applicable constitutional and statutory limitations on such damages.

16. Plaintiff has failed to mitigate his damages, if any.

17. Answering Defendants are entitled to a set-off or credit for any compensation, services, benefits, or other consideration that Plaintiff has received or may receive from any other source, including any recovery from Defendant LS, with respect to the same alleged injuries.

18. Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands, subject to proof during discovery.

19. Answering Defendants reserve the right to assert that some or all of Plaintiff's claims are subject to charitable immunity or other applicable immunity defenses available to nonprofit religious educational institutions and their uncompensated officers and trustees under Pennsylvania law.

20. Answering Defendants acted at all times in good faith, and their conduct was objectively reasonable under the circumstances.

21. Plaintiff's state-law claims for negligence and breach of contract are barred, in whole or in part, to the extent they arise solely from the same conduct underlying Plaintiff's federal disability-

discrimination claims and are therefore preempted by the ADA and/or the Rehabilitation Act. Answering Defendants preserve this defense notwithstanding the Court's ruling on this issue in its June 12, 2026 Memorandum Opinion.

22. Plaintiff's Section 504 claim is barred as a matter of law because DCA did not receive or use federal financial assistance within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) during the period when the operative alleged incidents occurred. Even assuming, without conceding, that a PPP loan constitutes "federal financial assistance" for purposes of Section 504, any such assistance and any attendant obligations ceased upon forgiveness of the loan, as Section 504 applies only during the period in which federal funds are accepted.

23. Plaintiff lacks standing to pursue prospective declaratory or injunctive relief under Section 504 of the Rehabilitation Act because Plaintiff graduated from DCA in 2025 and cannot establish a real and immediate threat of future injury. Answering Defendants preserve this defense notwithstanding the Court's determination that dismissal of this request would be premature at the pleading stage.

24. CM was not excluded from participation in, denied the benefits of, or otherwise subjected to discrimination in any program or activity at DCA by reason of his disability.

25. Answering Defendants reserve the right to assert additional affirmative defenses that may become available or apparent through further investigation and discovery, and to amend this Answer accordingly.

Respectfully submitted,

**O'HAGAN MEYER, PLLC**

Dated: June 26, 2026                    BY:   /s/ *Hillary B. Weinstein*
                                        John P. Morgenstern, Esquire
                                        Hillary B. Weinstein, Esquire
                                        Elizabeth A. Castillo, Esquire

29

PA ID Nos: 80014/209533/332138
Three Logan Square
1717 Arch Street, Suite 3910
T: 215-461-3300
F: 215-461-3311
JMorgenstern@ohaganmeyer.com
HWeinstein@ohaganmeyer.com
ECastillo@ohaganmeyer.com

30

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **C.M., individually and through his Parents, CM SENIOR and JM,** | : : : : | |
| Plaintiff, | : : | CIVIL ACTION NO. 5:26-CV-00007-JMG |
| v. | : : : | |
| **DAYSPRING CHRISTIAN ACADEMY, et al.,** | : : : | |
| Defendants. | : : | |

**CERTIFICATE OF SERVICE**

I, Hillary B. Weinstein, Esquire, hereby certify that on this date, a true and correct copy of the foregoing Answer and Affirmative Defenses to Plaintiff's Complaint was sent to all counsel of record via the ECF system.

Respectfully submitted,

**O'HAGAN MEYER, PLLC**

BY: *Hillary B. Weinstein*
John P. Morgenstern, Esquire
Hillary B. Weinstein, Esquire
Elizabeth A. Castillo, Esquire
PA ID Nos: 80014/209533/332138
Three Logan Square
1717 Arch Street, Suite 3910
T: 215-461-3300
F: 215-461-3311
JMorgenstern@ohaganmeyer.com
HWeinstein@ohaganmeyer.com
ECastillo@ohaganmeyer.com

Date:   June 26, 2026